## UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MARYLAND
### (Northern Division)

| | |
|---|---|
| MELANIE HOOD-WILSON, | |
| *Plaintiff,* | |
| v. | Case No.: 1:20-cv-00124-LKG |
| BOARD OF TRUSTEES OF THE COMMUNITY COLLEGE OF BALTIMORE COUNTY | |
| *Defendant.* | |

## PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF HER OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Plaintiff opposes Defendant's motion for summary judgment on three grounds: (1) Plaintiff has several witnesses who have corroborated her allegations about the racist culture perpetuated by Defendant's workplace practices and one of its Deans Louise Slezak; (2) Plaintiff has set forth direct and circumstantial evidence that she was more qualified than Bernardy and yet, he was selected for the Assistant Dean of Workforce Solutions position. Specifically, witnesses have testified that Bernardy was one of three White men who were pre-selected for the three positions that Defendant created with them in mind and manipulated the hiring process to ensure that Bernardy would outscore Plaintiff; and (3) that Slezak's primary motivation was based on Plaintiff's race and gender, which is consistent with her history of promoting lesser qualified whites over Blacks and favoring White men over Black Women who were more qualified. Plaintiff's arguments are fully set forth below.

## I.    <u>PLAINTIFF'S STATEMENT OF MATERIAL FACTS IN DISPUTE</u>

1. Melanie Hood-Wilson began working at CCBC as a part time coordinator in Fall 2001 and worked in that position until 2006. **Def. Ex. 1, JR 25 (Plaintiff Depo. at 25:1-17).**

2. She was tasked with developing strategies and programming to keep the Single Step program alive **_without_** Federal Funding that had sustained the program for the first five years. Her former boss, Louise Slezak, said, "she built the program." **Def. Ex. 14, JR 676 (Slezak Depo at 42:10-25).**

3. It is undisputed that, through her work, alone, Mrs. Hood-Wilson increased annual revenue of the Single Step program from less than $30,000 in 2001 to more than $500,000 when she was forced to resign in 2018. **Def. Ex.14, JR 677 (Slezak Depo. at 43:1-16).**

4. Melanie Hood-Wilson increased enrollment of the Single Step program from fewer than 8 unduplicated enrollments to more than 300 unduplicated enrollments between 2001 and 2018. **Def. Ex. 16, JR 1047.**

5. During her tenure, she received annual performance evaluations of satisfactory or better for each year of full-time employment at CCBC. **Pl's Exs. 22-26, JR1112-1189.**

6. Even when working under Dean Louise Slezak, Mrs. Hood-Wilson received annual performance evaluations of satisfactory or better each year. **_Id._**

7. Mrs. Hood-Wilson excelled at her job despite the fact that she was given less resources than other Program Directors. **Pl.'s Ex.17, JR1048-50, Riden Decl. at ¶8; Jarina Lloyd Decl. ¶¶2-3 and ¶14.**

8. Employees observed Louise Slezak deliberately withholding resources from Mrs. Hood-Wilson because she wanted to prevent Mrs. Hood-Wilson from being promoted within the Continuing Education Department. **Pl.'s Ex.17, JR1048-50, Riden Decl. at ¶8.**

9. One employee who worked in the Single Step program said that they "had few resources but we rose to the occasion because we loved the students and we loved what we did." She affirmatively stated that CCBC did not provide Plaintiff and her team "the support that we really needed." **Pl.'s Ex.18, JR1054-56, Jarina Lloyd Decl., at ¶14.**

10. For example, on multiple occasions between 2016 and 2019, Melanie Hood-Wilson requested full time assistance from a program coordinator. **Def.'s Ex. 14, JR 681-682 (Slezak Depo. at 47:23-48:1).**

11. Slezak refused to approve her requests for assistance saying that Plaintiff's budget did not cover the additional resources. *Id.* **at 48:1-8, JR 681-682.**

12. Slezak would not admit that she refused to use external resources to satisfy Plaintiff's request for additional staff support. She just kept referring to Plaintiff's budget and how it was insufficient. **Def.'s Ex. 14, JR 851-852 (Slezak Vol. II, 67:20-68:2)**.

13. While Mrs. Hood-Wilson's program brought in more revenue and had more enrollments than Mr. Bernardy's progam, he, a White male[1], had multiple full-time assistants and other full time staff. **Def. Ex. 7, Matthew Bernardy Deposition Transcript, JR 493-95.**

14. When posted in 2018, the Dean of Workforce Solutions outlined supervision of the following programs: Job Network- CCBC's welfare to work program; Center for Adult and Family Literacy- GED, ESOL; Out of School Youth- programming for high school

---

[1] Bernardy is White in appearance but his nationality is Spanish/Latin.

age students who have exited public school; Single Step- Open enrollment course and career training certifications for individuals with disabilities and Center for Access-programming for individuals with disabilities in day treatment center. **Def. Ex. 4. JR 467.**

15. Mrs. Hood-Wilson's background and experience far exceeded that of Mr. Bernardy's in relationship to the qualifications necessary to excel in the Assistant Dean position. **Pl.'s Ex.17, JR1048-50, Riden Decl. at¶¶ 6-8**.

16. For example, Melanie Hood-Wilson had served as the interim chair of Baltimore County Department of Economic and Workforce Development (DEWD) and led the WIOA planning and writing team for services to underserved and disadvantaged communities (individuals with barriers to employment). This work involved partnering with agencies across the county to develop strategies for access and the braiding of funding streams to provide services.

17. Matt Bernardy had only participated as a committee member and made minor contributions to barriers to employment committee for which she served as the interim chair that summer. **Ex. 28 at ¶4, JR1190-92.**

18. While chairing the committee that Bernardy served on, Mrs. Hood-Wilson did the lionshare of the work in producing a document outlining many of the strategies that would be needed for the new government program to be a success for people with disabilities, people, living in poverty, people with transportation issues, young parents, etc. *Id.*

19. Most of CCBC's students with disabilities live on social security disability benefits, making them a very disadvantaged and underserved population.

20. Mrs. Hood-Wilson's application and resume showed her experience working with students in Baltimore City Public Schools serving disadvantaged and underserved populations.

Hood-Wilson discussed her experiences growing up in and later serving disadvantaged and underserved communities. **JR 461-464.**

21. Despite her challenges, she single-handedly grew CCBC's Single Step program in revenue and enrollment more than 10-fold. **Ex. 28 at ¶7, JR1190-1192.**

22. Employees witnessed Bernardy's failed leadership in program administration and grants management. For example, he was provided the opportunity to lead a grant-based program that CCBC had for out of school youth and Bernardy was unable to sustain once grant funding ended. **Pl.'s Ex.17, Ridden Decl. at ¶17, JR1048-50.**

23. Employees provided sworn testimony stating that it was clear that Slezak appointed Bernardy to run this program knowing full well that he did not have the experience. **Pl.'s Ex.17, Ridden Decl. at ¶¶17, 19.**

24. Employees also stated that Bernardy waited six months into the grant year to hire staff. *Id.* **at ¶18.**

25. In fact, he failed so badly in implementing the program that Slezak asked staff from the GED department to take on some of the students who'd enrolled in the Connections to Employment program due to the lack of competent infrastructure within the program. *Id.* **at ¶¶20-21.**

26. Slezak admitted challenges but not the extent of them. **Def.'s Ex. 14**, **Slezak, Vol. 1, at 64:5-65:12, JR698-99.**

27. Employees also stated that Slezak and Bernardy engaged in fraud to cover up Bernardy's failed leadership. **Pl.'s Ex.17, Ridden at ¶¶19-22, JR1048-50.**

*28.* Specifically, when Slezak moved his enrollees to the GED program to get assistance, Bernardy still reported to funders that his program was servicing them, which is fraudulent reporting.  Slezak oversaw and approved Bernardy's fraudulent reporting.  *Id*.

29. Employees believed that Slezak allowed this to bolster Bernardy's application for the Assistant Dean of Workforce Solutions because Mrs. Hood-Wilson's credentials over-shadowed his.  *Id.* **at 19.**

30. Riden testified that she witnessed Slezak cover up fraud and fiscal mismanagement when Bernardy was the culprit but would falsely accuse Black employees like Mrs. Hood-Wilson of fraud over minor mistakes.  *Id.* **at 24.**

31. Another employee was victim of Slezak's false accusations.

32. Jarina Lloyd worked part-time for Mrs. Hood-Wilson.  She is African-American. **Pl.'s Ex. 18, JR1054-57.**

33. Slezak accused her of falsifying her time to get more hours.  However, other white staff who were in charge of payroll stated that they knew this was not true.

34. Karen Paris, Director of Marketing and Adjunct Faculty Support, which oversees paying all of the adjunct faculty of Continuing Education. **Pl.'s Ex. 20, Paris depo at 9:3; 11:14-18, JR1093-94.**

35. Ms. Paris, is White. *Id.*

36. Ms. Paris testified under oath that neither Mrs. Hood-Wilson nor her two part-time coordinators, Jarina Lloyd and Rikeah Glass, intentionally falsified time. **Pl.'s Ex. 20, Paris at 25:15-22**, JR1097-99.

37. Ms. Paris testified that HR decided to implement a new time-keeping system and that she thought it was a bad idea to do because (1) she felt that professionals should not be filling

out timesheets and (2) that it was better for the college to keep paying them contractually vs. hourly because the coordinators worked way more hours than they were compensated for under contract. **Pl.'s Ex. 20, 27:18-28:10, JR1097.**

38. Ms. Paris testified that she was aware that Slezak sought to discipline Mrs. Hood-Wilson and her two African-American coordinators. **Pl.'s Ex. 20, 32:6-18, JR1098.**

39. She said that she felt that it was "unfounded" and "unfair." **Pl.'s Ex. 20, 33:1 and 35:1, JR1098-1105.**

40. Ms. Paris testified that Mrs. Hood-Wilson sought assistance with the new timekeeping system multiple times and whenever she offered to assist her she said she was told "This isn't part of your job, Karen." **Pl.'s Ex. 20, 35:10-18, JR1098-1105.**

41. Another employee said that Slezak trumped up the timekeeping issue against Mrs. Hood-Wilson to justify not promoting her over Bernardy. **Pl.'s Ex. 17, Riden Decl. at ¶15**, JR1048-50.

42. She further stated that Slezak intentionally maligned Mrs. Hood-Wilson's reputation at the college while she and Bernardy were committing legitimate fraud. *Id.* **at 16, JR1049.**

43. Several employees stated that Slezak was racist and treated black employees differently than white employees.

44. Tenesha Riden, an African-American woman, stated:

"While at CCBC, I was often disturbed by the way administration and staff treated Black women educators. We were demonized, demeaned and if we advocated for ourselves we were chastised for it. By contrast, our White colleagues were never chastised or penalized for advocating for themselves and were treated more favorably by administration than Black employees even when they violated college policy." **Pl.'s Ex. 17, Riden Decl. at ¶3, JR1048-50.**

45. Jarina Lloyd, an African-American woman, stated:

"We were exposed to racism on a daily basis but many of us tolerated it because we needed an income. We were treated differently than White employees. There was misconduct and violations of CCBC policy committed by White employees but it would be brushed under the rug. Meanwhile, we had been reprimanded for actions that were not our fault." **Pl.'s Ex. 18, Lloyd Decl. at ¶15, JR1054-57.**

46. About Slezak's false accusations that she had committed time card fraud while working under Mrs. Hood-Wilson Lloyd stated: "Louise Slezak treated us as if we deliberately stole money. She wrote Rakeah and I up and indicated that we engaged in dishonesty. I told her that her actions were unethical because she knew the payroll system was dysfunctional for the continuing education staff and yet she was penalizing us. They had no codes for us to put in time for the work that we did." *Id.* **at ¶12, JR1055.**

47. Employees also stated that Slezak and Bernardy both made inappropriate comments about people based on protected characteristics under Title VII.

48. For example, Ms. Paris witnessed Slezak tell a hiring committee not to hire "old people because they take too much sick time." **Pl.'s Ex. 20, 56:3-17, JR1095-1111.**

49. Similarly, Bernardy was heard referring to a Black employee as "fucking old" and said that she had "African ways" in reference to her nationality. **Pl.'s Ex. 17, Riden Decl. at ¶13, JR1048-50.**

50. Ridden also testified that Slezak treated Black employees disparately when it came to discipline. She cited Plaintiff Hood-Wilson as an example. **Pl.'s Ex. 20, JR1091-1111.**

51. Ridden said that she witnessed Slezak and Bernardy commit fraud against the college: "I did not respect Matt or Louise because I saw how they operated to cover up fiscal mismanagement and fraud whenever Matt committed it, but when it came to any Black staff who made even a minor mistake, Louise escalated matters and blew things way out of proportion." *Id.* **at ¶24, JR1098-1111.**

52. Ridden referenced the false accusations that Slezak leveled against Hood-Wilson about the alleged time card fraud "was just another one of Louise's schemes to discredit a Black female employee." **Pl.'s Ex. 17, Riden at ¶15, JR1048-50.**

53. Employees also noted how Slezak promoted White employees over Black employees who were more qualified.

54. Tenesha Ridden stated: "I did not enjoy working under Louise Slezak. I observed her create positions for people who were not always qualified. Meanwhile, she overlooked qualified candidates for those same positions. This was particularly true when it came to Black employees." *Id.* **at 4, JR1048.**

55. She asserted that this is what she believed happened to Melanie Hood-Wilson. *Id.* **at 6-8, JR1050.**

56. Prior to the beginning of the interview process for the Assistant Dean of Workforce Solutions, Karen Paris notified Mrs. Hood-Wilson of what she perceived to be evidence that the competitive process had been rigged by the executive leadership at the college so that certain candidates would be selected based on bogus test scores. **Pl.'s Ex. 20, Paris at 40:12-44:3, JR1091-1111.**

57. Specifically, she saw an email that indicated that the college needed to create three upgraded positions as promotions for three particular employees who they were afraid would leave the college if they were not promoted. **Pl.'s Ex. 20, Paris at 42:7-12, JR1093-1111.**

58. These three employees were White men. **Pl.'s Ex. 20, Paris at 50:9-19, JR1091-1111.**

59. These three employees were ultimately selected for all three of the Assistant Dean vacancies.

60. Ms. Paris testified that these three white men, Steve Jurch, Jay Bouis, and Matt Bernardy were pre-selected for the positions. **Pl.'s Ex. 20, 40:12-22; 42:7-12, JR1095-1105.**

61. Ms. Paris testified that pre-selection in academia is unethical and that she believed HR was complicit in the pre-selection of these three individuals. **Pl.'s Ex. 20, 45:1-17.**

62. Don Elliott, who applied for all three positions, also felt the selectees were not qualified. Elliot, **Pl.'s Ex. 20, 46:12-47:3, JR1091-1111.**

*63.* He stated that the interview questions were "tailored" to the three men who were ultimately selected. ***Id.***

64. Elliott, Plaintiff and Bernardy were all considered for the Assistant Dean of Workforce Solutions position.

65. Neither Plaintiff nor Elliott were selected.

66. Don Elliott is an openly gay, homosexual.

67. Employees stated that they felt Mrs. Hood-Wilson was more qualified than Matt Bernardy for the Assistant Dean of Workforce Solutions position. **Pl.'s Ex. 17, Riden Decl. at ¶7 and ¶27, JR1048-50.**

68. Mrs. Hood-Wilson was lauded by other staff for her expertise and experience working with various populations and external partners. **Pl.'s Ex. 18, Lloyd Decl. at ¶¶2-3, JR1054-57.**

69. After the selection of Matt Bernardy, Slezak issued a disciplinary action letter against Mrs. Hood-Wilson accusing her of "fiscal mismanagement" due to the overpayment of her part-time coordinators, Jarina Lloyd and Rakeah Glass.

70. The letter was couched as a "final warning" as if Mrs. Hood-Wilson had a history of fraud and fiscal mismanagement. **Def. Ex. 16, JR 617-619.**

71. Mrs. Hood-Wilson felt that Slezak was setting her up for termination and decided to resign in lieu of that. **Def. Ex. 1, JR 75-79 (Hood-Wilson Depo. at 75:18-79:8)**


## II.     ARGUMENT

Summary judgment is only appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). That is, where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *Bartel v. Sun Life Assur. Co. of Canada*, 536 F.Supp.2d 623, 626 (D. Md. 2008).   A fact is considered "material" if it is "one that might affect the outcome of the suit under the governing law." *Chaplick v. Jeng Fen Mao*, 215 F.Supp.3d 470, 478 (D. Md. 2016).

All Factual Inferences Must Be Viewed in Favor of Mrs. Hood-Wilson

When reviewing a motion for summary judgment "***the inferences to be drawn from the underlying facts must be viewed in the light most favorable to the non-moving party***." *Beall v. Ujoatuonu*, 369 F.Supp.3d 642 (D. Md. 2019)(emphasis added). "Summary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party..." *Anderson v. Liberty Lobby, Inc*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

It is Improper for the Court to Resolve Material Factual Disputes on Summary Judgment

These are questions for a jury to consider not the Court. It is well-settled that this Court cannot make credibility determinations when deciding summary judgment: ***"The district court's***

*function' is not to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial."* Anderson, 477 U.S. at 249; *accord Guessous v. Fairview Prop. Invs., LLC*, 828 F.3d 208, 216 (4th Cir. 2016). Because Plaintiff has pointed directly to the record to create a material dispute of fact, this is the law of the land, this Court must deny Defendants' motion for summary judgment on all counts.

<u>There Are Material Factual Disputes On This Record That Must Be Resolved by a Jury</u>

"Title VII prohibits discrimination 'against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race ....' 42 U.S.C. § 2000e-2." *Perkins v. Int'l Paper Co.*, 936 F.3d 196, 205 (4th Cir. 2019).

To establish a prima facie case for a failure-to-promote claim under Title VII, a plaintiff must demonstrate: "(1) she is a member of a protected group, (2) there was a specific position for which she applied, (3) she was qualified for that position, and (4) [her employer] rejected her application under circumstances that give rise to an inference of liability." *Walton v. Harker*, 33 F.4th 165, 176 (4th Cir. 2022) (quoting *Williams v. Giant Food* Inc., 370 F.3d 423, 430 & n.5 (4th Cir. 2004)).

Defendant does not dispute the first three elements of Mrs. Hood-Wilson's claim. **Def. Mot. at 14.** Instead it focuses its arguments on whether she has evidence of direct or indirect discrimination based on race and/or gender in the hiring process. On that score, Plaintiff's Statement of Material Disputed Facts establishes a factual dispute. **First**, there is a material factual dispute as to whether the three white male employees that Defendant promoted to Assistant Dean were deliberately pre-selected for the positions rather than engaging in legitimate competitive hiring and promotion process. **Second**, there is a material factual dispute as to whether Mrs. Hood-Wilson was in fact, more qualified for the position of Assistant Dean of Workforce Solutions, than Matt Bernardy—the man who was ultimately selected. **Third**, there is a material factual dispute

as to whether Defendant engaged in unlawful discrimination based on race and gender when it hired Matt Bernardy for the Assistant Dean of Workforce Solutions over Mrs. Hood-Wilson despite the fact that she was markedly more qualified for the position than he.

**A.** **There is Admissible Evidence that Hood-Wilson was qualified for the position and that the Hiring Process was Altered to Ensure that Matt Bernardy would Be Selected Over Hood-Wilson**

Defendant does not dispute that Mrs. Hood-Wilson was qualified but it argues that Bernardy was more qualified than she was for the Assistant Dean of Workforce Solutions based on his scores from the interview and his "experience." However, as Plaintiff has already discussed at length in this brief, the evidence suggests that the hiring process was altered so that Bernardy would have an unfair competitive advantage over Plaintiff so much so that the job description was written to fit his pre-existing role and the interview questions were tailored to him, and not to Mrs. Hood-Wilson. ***Supra* at 10 (¶¶ 62-63)**. Here, Plaintiff also points out that her experience and credentials dwarf Bernardy's on the critical areas required to be successful as an Assistant Dean in the Continuing Education Department. **Ex. 28 at ¶¶2-13**, **JR1190-92.** Employees who have worked with her corroborate her testimony.

Ms. Riden testified that "almost none of the people that Slezak hired for various positions were qualified for those roles." **Pl.'s Ex. 17, Riden Decl. at 6, JR1048-50.** When CCBC announced the three positions for assistant dean, Riden said that she "and several other employees in my department predicted who Louise would hire—all White men." *Id.* She further stated that "Melanie Hood-Wilson did not stand a chance although she was ***vastly more qualified for the Assistant Dean of Workforce Solutions position than Matt Bernardy***." *Id. (emphasis added).*

Defendant states that "Bernardy also had experience managing large numbers of people, which was an important skill for the Assistant Dean position." **Def Mot. at 4.** Mrs. Hood-Wilson actually

13

had experience growing a program which is part of what a leader in continuing education does. **Pl.'s Ex. 19, Elliott Depo., 39:15-41:4, JR1058-75.** Bernardy did not have this experience in program growth. Slezak acknowledged that Mrs. Hood-Wilson increased enrollment of the Single Step program from 8 unduplicated enrollments to more than 300 unduplicated enrollments between 2001 and 2018. **Def.'s Ex. 16, JR 1047.** She also increased annual revenue of the Single Step program from less than $30,000 in 2001 to more than $500,000 when she resigned in 2018. **Ex. 28 at 8, JR1190-95.** Slezak could not confirm whether Bernardy had sustained this growth at the time of her deposition. She cited to COVID being one of the reasons that revenue was affected but did not cite to any specific evidence. **Def's Ex. 14, JR 677 (Slezak, Vol. 1 at 43:1-16).**

It is undisputed that the Single Step program had more enrollments and brought in more revenue than Bernardy's programs. While Bernardy had multiple full-time assistants and other full-time staff, Slezak would not provide Hood-Wilson with this support. **28 at ¶9**. Slezak testified that she expected Hood-Wilson to find revenue for herself. **Def.'s Ex. 14, Slezak, Vol. 1 at 47:23-48:8, JR681**. This fact was corroborated by Riden and Lloyd who worked with Mrs. Hood-Wilson. Riden testified that Mrs. Hood-Wilson worked very hard to win a grant from Baltimore County for the college for the Out of School Youth program but when it was awarded, Slezak put it under Bernardy to administer although he had absolutely no experience working with out of school youth. **Ex. 17 at ¶7, JR1048-50.**

On the contrary, Hood-Wilson's resume shows that she has extensive experience working in Baltimore City Public Schools for six years serving disadvantaged and underserved populations. *Id.* **at 7; JR 461.** This was in line with her role as Director of the Single Step program which consisted of students with disabilities live on social security disability benefits, making them a

14

very disadvantaged and underserved population. **Pl.'s Ex. 20, Paris Depo. at 17:20-18:22, JR1091-1111.**

As for WIOA experience, Plaintiff chaired Baltimore County Department of Economic and Workforce Development (DEWD) and led the WIOA planning and writing team for services to underserved and disadvantaged communities (individuals with barriers to employment). Matt Bernardy participated only as committee member. **Ex. 28 at ¶4, JR1190-92.**

B. **Employees Have Admissible Evidence of Slezak's Racist Actions and Disparate Treatment of Black Women Employees like Plaintiff Melanie Hood-Wilson Thereby Supporting her Claims of Race and Gender Discrimination**.

The allegations against Slezak are incredibly damning, including employees who witnessed her engage in covering up fraud and fiscal mismanagement of White employees such as Bernardy while falsely accusing Black employees like Melanie Hood-Wilson of fraud and mismanagement over administrative errors. Employees also testified about Slezak's bizarre observations about Mrs. Hood-Wilson's breasts (**Pl.'s Ex. 17, Ridden at ¶11, JR1048-50**) and other off-putting and racist remarks made by her and her protégé Matt Bernardy (*Id.* **at ¶¶24-26, JR1048-50**). These allegations, together with Plaintiff's allegations in her amended complaint, present triable issues of fact as to whether Slezak treated Melanie Hood-Wilson differently than other employees on the basis of race, including the decision to non-select her for the Assistant Dean of Workforce Solutions position.

1. Slezak and Bernardy were Known to Make Racist and other Biased Remarks in the Workplace.

According to current and former CCBC employees, Black women employees at CCBC have felt "demonized, demeaned and if we advocated for ourselves we were chastised for it." **Pl.'s Ex. 17, Riden at ¶3, JR1048-50.** This feeling of racism was not just felt by faculty and staff. Some

have witnessed racism towards students as well. Jarina Lloyd testified that she witnessed CCBC students being treated harshly by staff or other students because of their race. For example, at the Dundalk campus, a group of Black students were threatened because they looked like "thugs" and were told to leave the campus by some of the police cadets although they had college identification cards. **Pl.'s Ex. 18, Lloyd at ¶16, JR1054-57**. Lloyd also testified that a white employee told her that she looked like a papoose. **_Id._**

In Slezak's department, the bias and racial tensions were extremely noticeable **_and acceptable._** For example, Bernardy was far too comfortable expressing his disdain for Black women employees. He once referred to an employee as "fucking old" and said that she had "African ways." **_Id._ at ¶13**. It was never reported to Slezak because, "[w]e knew that if we reported this to Louise that we would be fired or targeted." **Pl.'s Ex. 17, Riden at ¶13, JR1048-50**. Slezak would also intentionally call Black women employees by the wrong name and make off-putting and dehumazing jokes about them. For example, Louise would often mock Gloria Stackhouse by calling her 'Tenesha." **_Id._ at 10**. Slezak did this persistently despite the fact that Gloria told her constantly that her name was **_not_** Tenesha. **_Id._** Other White employees would laugh and snicker at Louise's constant mocking of Gloria and Tenesha Riden. **_Id._** Slezak also made perverse comments about Mrs. Hood-Wilson's anatomy to Riden—another Black woman. She told Riden that she'd heard about a meeting where "Melanie's breasts were rubbing against the white board as she wrote on it and it looked as if she wasn't wearing a bra." **_Id._ at 11.** Riden reported that after making this bizarre comment, Slezak started laughing. **_Id._**

Karen Paris, a white woman, stated that Slezak remarked to a hiring committee that Defendant should not hire "old people" because they "take too much sick leave." **Pl.'s Ex. 20, Paris Depo. at 56:3-17, JR1104.** Slezak had also made racially insensitive comments to Mrs. Hood-Wilson

about "city people" who "jump rent[2]" and then said "you'd know about that, right?" Slezak had also remarked to Hood-Wilson that she did not enjoy visiting Martha's Vineyard and stated, in the same breath, "there were a lot of Black people there." While Slezak denies or does not remember making most of these remarks and denies knowledge of Bernardy making any of the above remarks, there is a clear factual dispute over whether Slezak made racist remarks towards Black women that may have motivated her decision to select Bernardy over Mrs. Hood-Wilson. There is much more evidence to consider.

2.  <u>Slezak falsely accused and disciplined Black Employees for "fraud" when she and Matt Bernardy engaged in deliberate fraud and fiscal mismanagement on a program wide basis.</u>

Jarina Lloyd, a long-time employee at Defendant, was an adjunct professor and coordinator for the Single Step Program under Plaintiff. She testified that Mrs. Hood-Wilson had an excellent reputation in the community because of her program and that she "grasped what the students needed." **Pl.'s Ex. 18, Lloyd at ¶2, JR1054-58**. However, Mrs. Hood-Wilson was one of a few Black administrators, which she testified had not changed much by the time she left the college. *Id.* **at ¶6**. While she enjoyed the experience she gained while working under Mrs. Hood-Wilson she testified that working there was "extremely frustrating from an operations standpoint." **Pl.'s Ex. 18, Lloyd at ¶5, JR1054-58**. What is more, she had a lot to say about the racism that she observed on the campus.

She testified that Slezak falsely accused her of "double-dipping" or submitting time cards in a manner that would allow her to be compensated twice for the same time. **Pl.'s Ex. 18, Lloyd at ¶¶12-13, JR1054-58**. The truth is that Defendant transitioned to a new payroll system that wasn't designed for the continuing education side of the college. *Id.* **at ¶7**. That is, there were no

---

[2] This means people who do not pay rent.

timekeeping codes for the work that the adjuncts and coordinators performed. Id. The new system malfunctioned frequently so Ms. Lloyd and other adjuncts would sometimes go without their pay. *Id.* **at ¶8.** Moreover, there was no training provided to Ms. Lloyd or Mrs. Hood-Wilson's other adjunct Rakeah Glass on how to use the new time keeping system despite the fact that Mrs. Hood-Wilson asked for this training for her staff. **Pl.'s Ex. 20, Paris Depo. at 35:10-18, JR1091-1111.**

When the new system defaulted, Defendant refused to write checks to Ms. Lloyd in others so that they would be timely compensated. **Pl.'s Ex. 18, Lloyd at ¶7, JR1054-56**. On the other hand, if the system erroneously overpaid Ms. Lloyd and other adjuncts due to the system not properly recording their hours because there were no codes for them to select that corresponded with their tasks, Ms. Lloyd testified that she wrote a check back to Defendant whenever that happened. *Id.* **at ¶11.**

Karen Paris corroborated Ms. Lloyd's version of events. **Pl.'s Ex. 20, Paris Depo. at 33:1 and 35:1, JR1091-93.** But Slezak persisted in writing up Ms. Lloyd and Ms. Glass for engaging in "dishonesty." *Id.* **at ¶12.** Ms. Lloyd pushed back calling Slezak's actions "unethical" because she knew that the adjuncts and coordinators did not have the proper codes to select to put their time in and there were often duplicate entries as a result. *Id.* Ms. Lloyd also testified that Mrs. Hood-Wilson's program was understaffed and that she and her whole team went above and beyond to serve their students. *Id.* **at ¶14**. Paris acknowledged that the adjuncts often performed more work than they were compensated for but under the new system they'd be paid based on hours which wasn't as financially beneficial for the college even. **Pl.'s Ex. 20, Paris Depo. at 27:18-28:10, JR1091-1111.** Slezak denies any knowledge of problems with the timekeeping system at that time. **Def.'s Ex. 14, Slezak, Vol. 2 at 15:17-21, JR649.**

Lloyd cited the disparate treatment of Black employees compared to White employees. She said the Blacks "were exposed to racism on a daily basis[3]" but tolerated it to keep their jobs. **Ex. 18. at ¶15**. She also testified that when White employees committed misconduct it was swept under the rug, but Blacks were penalized for things that they did not do. *Id.* Tenesha Ridden corroborated this statement.

3. <u>Employees Witnessed Slezak and Bernardy Engage in Deliberate Fraud and Dishonesty</u>.

Ridden witnessed Slezak engage in fraud to cover up for Matt Bernardy's poor management of a grant and poor program leadership. **Ex. 17 at ¶24, JR1048-50**. These are arguably two of the most important qualifications required to be Assistant Dean of Workforce Development. *Id.* **at ¶24.** Defendant had won a one year grant that Slezak put Bernardy in charge of for the purpose of overseeing a workforce development program. Unfortunately, due to his inexperience and lack of organization, he did not hire staff until the grant year was nearly half over and Slezak asked Ridden and her team if they could provide instruction to Bernardy's students, meanwhile Bernardy still submitted reporting requirements as if the students remained in his program for the full grant year. *Id.* **at ¶¶20-24.** This was intentional fraud on Slezak's part. However, according to Ridden, Lloyd, and Karen Paris, Slezak *falsely* accused Melanie of fraud when it came to her staff's timekeeping errors when it was clear that the administration had not properly implemented the new timekeeping system throughout the college. **Pl.'s Ex. 17, Riden at ¶¶22-23, JR1048-50; Pl.'s Ex. 18, Lloyd supra at ¶18, JR1054-57; Pl.'s Ex. 20, Paris at 25:15-22; 33:1 and 35:1, JR1091-1111.** All of these employees testified that Slezak's actions were

---

[3] Lloyd testified that a White employee told her that she looked like a papoose. She also saw campus police question Black students as if they did not attend the college and did not belong on campus although they were students who'd been on campus every day.

unfounded. *Id.* Slezak agreed that their actions were not intentional but felt that they were "incompetent." **Def.'s Ex. 14**, **Slezak, Vol. 1, at 83:5-21, JR719.**

### 4. Slezak's Habit of Promoting Whites to Positions for Which They Are Not Qualified Over Qualified Blacks Is Well-Known.

Ridden said that she'd witnessed Slezak promote non-qualified whites to positions for which they had no experience or background. **Pl.'s Ex. 17, Riden at¶ 6, JR1048-50** For example, Slezak selected Kim Sansone to replace Ridden's former supervisor, Ann Bonner. Sansone was not an educator at the time and had no background in developing educational programs. *Id. at ¶5.* However, "Kim is White" and that is why Slezak promoted her. *Id.* Ridden testified that when Sansone was her supervisor she had to lean on Mrs. Hood-Wilson a lot because "she is a seasoned educator and could relate to all of the issues that I had in the role while at CCBC." *Id.* Sansone, on the other hand, did not know what she was doing. *Id.*

Ridden testified that Slezak used her authority to manipulate the hiring process so that Bernardy was selected over Hood-Wilson for the Assistant Dean of Workforce Solutions position. For example, Slezak appointed Bernardy to oversee the implementation of a particular grant so that he could bolster his experience for the assistant dean position that she passed over Mrs. Hood-Wilson to give him. **Pl.'s Ex. 17, Riden at ¶19, JR1048-50.** Ridden testified that, in her observation, Bernardy was not as qualified as Melanie Hood-Wilson for the position of Assistant Dean of Workforce Solutions. "At the end of the day, I was sad to see that Melanie was not promoted because her qualifications, skills and work ethic far exceed those of Matt Bernardy's, but I was not surprised at all given the circumstances that I personally observed as an employee at CCBC." *Id. at ¶27.* Ridden provided specific examples of Bernardy's ineptness in program development and oversight.

"Melanie is an educator and she has a background in working with adults with disabilities. That is not Bernardy's background."  She further stated that Melanie helped CCBC get a grant from Baltimore County for out-of-school-youth, but that once the grant was awarded "Slezak allocated the funds to Bernardy—who had no expertise or background in working with out of school youth at the time of the award and allocation.  Matt failed miserably at administering this grant for the college." **Pl.'s Ex. 17, Riden at ¶7, JR1048-50.**

## C. There is a Jury Question as to Whether Defendant Rejected Her Application for Assistant Dean Under Circumstances that Give Rise to an Inference of Liability.

Defendant does not dispute that Plaintiff meets the first three elements of her claim so she will move to analyze the fourth element.  "Title VII prohibits discrimination 'against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race ....' 42 U.S.C. § 2000e-2." *Perkins v. Int'l Paper Co*., 936 F.3d 196, 205 (4th Cir. 2019).

To establish a prima facie case for a failure-to-promote claim under Title VII, a plaintiff must demonstrate: "(1) she is a member of a protected group, (2) there was a specific position for which she applied, (3) she was qualified for that position, and (4) [her employer] rejected her application under circumstances that give rise to an inference of liability." *Walton v. Harker*, 33 F.4th 165, 176 (4th Cir. 2022) (quoting *Williams v. Giant Food* Inc., 370 F.3d 423, 430 & n.5 (4th Cir. 2004)).

"The McDonnell Douglas framework -- which requires the plaintiff to show (1) membership in a protected group, (2) qualification for the job in question, (3) an adverse employment action, and (4) circumstances supporting an inference of discrimination" permits a plaintiff to establish her claim via direct or indirect evidence. If the plaintiff can make out his prima facie case, the

burden then shifts to the employer to articulate some legitimate, nondiscriminatory reason for the action challenged. *Dougherty v. CNN*, 396 F. Supp. 3d 84, 101 (D.D.C. 2019) (cleaned up). "Once an employer has proffered a legitimate nondiscriminatory reason for its action…'the district court need not—and should not—decide whether the plaintiff actually made out a prima facie case under McDonnell Douglas.'" *Brady v. Office of Sergeant at Arms*, 520 F.3d 490, 494 (D.C. Cir. 2008) (emphasis in original). The Court's only job at this point is to determine "whether there is sufficient evidence for a reasonable jury to find that the asserted rationale is pretextual and that the real reason for the employer's action was to retaliate against the employee for engaging in protected activity. *See Jones v. Bernanke*, 557 F.3d 670, 678 (applying Brady analysis to retaliation claim) (D.C. Cir. 2009).

Here, Plaintiff can show that there is a material factual dispute as to the fourth prong for three reasons that consist of direct and indirect evidence of gender and race discrimination. ***First***, there is witness testimony from at least three different CCBC employees asserting their belief that Matt Bernardy was pre-selected for the Assistant Dean of Workforce Solutions. ***Second***, there is evidence that Mrs. Hood-Wilson was in fact more qualified for that position than Mr. Bernardy at the time he was selected over her. And ***third***, there is a plethora of evidence, including statements from various current and former employees that Slezak and CCBC fostered an environment of discrimination against Black women employees by promoting lesser qualified white males over them, falsely accusing them of misconduct as a basis for criticism and heavy-handed and unfair discipline.

1. *The jury must resolve the question as to whether Defendant deliberately altered the hiring process such that Bernardy and the other white male candidates would score higher than Mrs. Hood-Wilson.*

Mrs. Hood-Wilson has alleged in her amended complaint that she applied for an Assistant Dean position after leading the college's only program for students with disabilities and growing it to epic proportions. **Def.'s Ex. 16, JR 1047.**  Her leadership of the program made Defendant the foremost program in the State for students with disabilities. **Ex. 28.**  Her ability to engage stakeholders and partners to raise money for her program was highly lauded. ***Id.*** She wanted to take on a higher position at the college but knew that as a Black woman she would likely be passed over due to Defendant's racist culture and the bias espoused by her supervisor Louise Slezak against Black women employees in the continuing education department, which Slezak oversaw. Other witnesses corroborate her allegations about Defendant's racist environment and how Slezak is one leader who perpetuates racism and other biases without consequence.

Several employees have provided sworn testimony about the racist and biased environment fostered by Slezak and Defendant.  These statements not only provide support for Mrs. Hood-Wilson's theory that she was non-selected because she was a Black woman but some of the witness also corroborate Mrs. Hood-Wilson's allegations that Defendant pre-selected three male candidates. Those men did not have to engage in a competitive process thanks to the executive leadership at the college and Slezak working in concert to ensure their selection by asking questions that were deliberately tailored to their specific knowledge and experience as opposed to questions that are directly relevant to continuing eduation program experience and development. **Pl.'s Ex. 19, Elliott Depo., at 46:16-47:3, JR1061.** Mrs. Wilson discusses the testimony about the hiring process in detail.

2. <u>Leadership at the College Questioned the Integrity of the Selection Process for the Assistant Dean Positions and Felt that It Was Designed to Pre-Select Three White Males.</u>

Mrs. Hood-Wilson was not the only one who took issue with the hiring process.  The issue was first raised when Karen Paris, Director of Marketing and Adjunct Faculty Support, inadvertently saw an email that had been printed out and placed in a travel folder made for Mike Netzer but was given to her because she was asked to travel in his stead to a conference in Georgia. Mrs. Hood-Wilson attended the same conference.  Director Paris reviewed the contents of the folder and saw an email from Mike Netzer to the President of the College, Dr. Kurtinits, stating that Defendant had created three assistant dean positions for certain employees so that they would not leave the college.  **Pl.'s Ex. 20, Paris Depo. at 40:12-22-42:7-12, JR1091-99.**  Those employees were Steve Jurch, Jay Bouis and Matt Bernardy.  According to Director Paris, all three of these men are White[4].  *Id.* **at 50:9-19.**  Director Paris said she returned the email and did not keep copies of it because it was not addressed to her.  *Id.* **at 42:16-43:3.**

Director of Continuing Education, Don Elliott, personally shared his observations and those of other employees about the irregularities in the hiring process beginning with the makeup of the hiring committee.  Generally speaking, he thought the hiring committee was "oddly chosen for an Assistant Dean position."  **Pl.'s Ex. 19, Elliott Depo. at 30:12-14, JR1058-65.  First**, he indicated that it was irregular for Louise Slezak to be on the committee at the interview stage because she was one of hiring managers along with Mike Netzer. *Id.* at 39:15-40:6. He also thought "it was strange" that there was a "lack of program people" on the committee. *Id.* at 40:8-9. He said once he saw who was on the hiring committee he thought to himself "why are these folks here?" *Id.* at 30:12-31:7. He said he spoke with other applicants and they were like "what was that about" in reference to who was on the committee. *Id.* at 40:14-17. He also said it was unusual to Slezak's

---

[4] Bernardy referred to himself as "Hispanic" during a deposition but his co-workers have testified that he is perceived to be white. Karen Paris stated that she believes that he is White. **Ex. 20 at Paris at 50:9-19.** Hood-Wilson said that he is white Latino man. **Ex. 1 at 148:19-21.**

own administrative assistant on the committee due to impartiality concerns. 35:10-36:1. Moreover, Slezak's assistant lacked the relevant program experience to contribute anything meaningful to the committee. 35:1-9. He also noted that none of the people on the committee had any background in Mrs. Hood-Wilson's program. 38:18-39:7. This factor alone could explain why Mrs. Hood-Wilson scored the lowest on the interview questions but there is so much more to corroborate that theory.

**Second**, Director Elliott indicated that the interview questions were irregular in that they were not "targeted" questions about "program experience, and program development and program growth." *Id.* at 40:18-41:1-4. Had these questions been asked, Plaintiff Hood-Wilson would have ranked higher than Bernardy—who was her competitor—for the Assistant Dean of Workforce Solutions position for reasons set forth later in this memorandum.  Instead, as Director Elliott testified, the questions that were asked of the interviewees were tailored to the pre-selected males:

> "It was kind of like – and you were like sitting there as an applicant and you're like okay, that's the Steve question. And then there was another question that I can't remember but it was like okay, that's the Jay question." *Id.* at 47:15-19.

Elliott reviewed specific questions and said that No. 5, which was about WIOA funding, was slated towards Matt Bernardy and not relevant for the Assistant Dean position because "we [the college] don't use WIOA that much as a funding source." **Pl.'s Ex. 19, Elliott Depo. at 60:21-61:2, JR1058-65.**  He also said that in addition to certain questions being tailored for certain pre-selected individuals some of the questions were simply not relevant to the position of Assistant Dean. For example, there was a question about performance based contracts and grants but, according to Director Elliott, such contracts and grants are not used that frequently in the Continuing Education department.  **Pl.'s Ex. 19, Elliott Depo. at 61:5-14, JR1058-65.**  He noted

that Bernardy had just received a performance based contract so that question was slated towards him as well. Elliott harped on the fact that many of the interview questions, such as the approximate the # were just not relevant to an assistant dean position. ***Id.***

Elliott further testified that the questions were not "about creating courses…or your personal experience in growing programs and courses, but it was a lot of factual details such as how much FTE does the college produce for the year, or where do you find personnel procedures." ***Id.* at 31:9-18.** Elliott felt that these were like "trivia" questions. ***Id.* at 63:10-12.** Specifically, he questioned the committee: "the Assistant Dean as leading an academic unit is required to grow programs and to provide quality instruction. And you're asking where do you find the college's travel reimbursement policy?" ***Id.* at 63:12-16.**

Director Elliott applied for all three vacancies and was non-selected. It is undisputed that he is an openly gay male. **Pl.'s Ex. 19, Elliott depo at 120:18-21, JR1058-66.** Elliott also believed he was equally if not better qualified that those selected. ***Id.* at 44:16-18.** Elliott confirmed that aside from Plaintiff there were no other African-American applicants for the Assistant Dean of Workforce Solutions to his knowledge. ***Id.* at 41:15-42:1.**

A ***third*** problem that Director Elliott raised was the vacancy announcement for each position seemed to be tailored to the three males who were allegedly pre-selected. He testified that "the writing was on the wall" that these men were pre-selected because the announcements mirrored the already-existing job descriptions for Steve Jurch, Jay Bouis and Matt Bernardy. ***Id.* at 44:9-13**. Elliott testified that he hesitated in applying because it was so "obvious" that the vacancy announcements were "tailored" to the pre-selected White (and straight) males. His suspicion was confirmed, according to him, after the interview when he learned of the email that Mike Netzer had sent to President Kurtinitis stating that they needed to create positions to keep

the pre-selected men at the college. **Pl.'s Ex. 19, Elliott depo. at 44:18-45:19, JR1058-66**. Karen Paris was the one who saw the email and showed it to Plaintiff and later told Elliott because she learned that he was applying for the positions as well. **Pl.'s Ex. 20, Paris depo at 40:12-22-42:7-12, JR1091-98.**

### III.    CONCLUSION

Plaintiff, at a *minimum*, has set forth circumstantial evidence that her race and gender, or, her race *or* gender were factors in her non-selection. The burden has duly shifted to Defendant to show that their proffered reasons for her non-selection were motivated by something other than race and gender. Based on the record, Defendant cannot meet that burden.

Dated: June 20, 2024

Respectfully Submitted,

/s/ *Yaida O. Ford*
Yaida O. Ford, # 497013
**Ford Law Pros, P.C.**
1001 L Street, SE
Washington, DC 20003
Office: (202) 792-4946
*yford@fordlawpros.com*
*Attorney for Plaintiff Melanie Hood-Wilson*

<u>**CERTIFICATE OF SERVICE**</u>

I certify that on June 20, 2024 a copy of the foregoing was served via PACER upon the following:

Vincent P. Jackson, #20878
Kollman & Saucier, P.A.
The Business Law Building 1823 York Road
Timonium, Maryland 21093
(410) 727-4300
(410) 727-4391 - fax
vjackson@kollmanlaw.com

Attorney for Defendant

/s/ Yaida O. Ford